**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **EAGLE INDUSTRIES, LLC** | ) | **CHAPTER 11** |
| | ) | |
| Debtor | ) | **CASE NO. 10-11636** |
| ———————————————— | ) | |
| | ) | <u>**Jointly Administered**</u> |
| IN RE: | ) | |
| | ) | |
| **EAGLE TRANSPORTATION, LLC** | ) | **CHAPTER 11** |
| | ) | |
| Debtor | ) | **CASE NO. 10-11637** |
| ———————————————— | ) | |

<u>**DEBTORS' PROPOSED**</u>
<u>**DISCLOSURE STATEMENT**</u>
<u>**DATED AUGUST 22, 2011**</u>

Respectfully submitted,

/s/ Tyler R. Yeager
DAVID M. CANTOR
TYLER R. YEAGER
SEILLER WATERMAN LLC
Meidinger Tower, 22nd Floor
462 South 4th Street
Louisville, Kentucky 40202
Telephone: (502) 584-7400
Facsimile: (502) 583-2100
E-mail: cantor@derbycitylaw.com
E-mail: yeager@derbycitylaw.com
*Counsel for Eagle Industries, LLC and Eagle*
*Transportation, LLC*

## I.      INTRODUCTION

This is the disclosure statement (the "<u>Disclosure Statement</u>") in the chapter 11 cases of Eagle Industries, LLC ("<u>Industries</u>") and Eagle Transportation, LLC ("<u>Transportation</u>," and collectively, with Industries, the "<u>Debtors</u>" or "<u>Plan Proponents</u>") which were commenced on October 27, 2010 (the "<u>Petition Date</u>").   This Disclosure Statement contains information about the Debtors and describes their Joint Plan of Reorganization (the "<u>Plan</u>") filed on August 22, 2011.   A full copy of the Plan accompanies this Disclosure Statement and is incorporated herein by reference.

***Your rights may be affected.  You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney.  If you do not have an attorney, you may wish to consult one.***

The proposed distributions under the Plan are discussed at pages 9 – 13 of this Disclosure Statement.  The Plan classifies claims of general unsecured creditors in Class 4, and contemplates partial repayment of said claims through cash distributions from the Debtors' revenues to be generated following Confirmation of the Plan, as well as proceeds from Avoidance Actions successfully prosecuted and collected by the Committee or its assignee.

### A.      Purpose of this Disclosure Statement

This Disclosure Statement describes:

- the Debtors and significant events during their bankruptcy cases;

- how the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you can expect to receive on your claim or equity interest if the Plan is confirmed);

- who can vote on or object to the Plan;

- what factors the Bankruptcy Court will consider when deciding whether to confirm the Plan;

- why the Debtors believe the  Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation; and

- the effect of confirmation of the Plan.

It is important to read the Plan as well as the Disclosure Statement.  This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

### B.      Disclaimers

No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein, and, if given or made, such information or representation may not be relied upon as having been authorized by the Debtors.  Although the Debtors will make available to creditors entitled to vote

on acceptance of the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the financial information regarding the Debtors and the liquidation analyses relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

**All creditors are encouraged to read and carefully consider this Disclosure Statement, including the Risk Factors described under Article III, and the Plan prior to submitting ballots in response to this solicitation.**

C.      **Important Deadlines and Dates**

The Bankruptcy Court's Order Approving this Disclosure Statement will contain important information concerning the dates by which you may vote to accept or reject the Plan.

The Bankruptcy Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1.      *Time and Place of the Hearings to Approve this Disclosure Statement and Confirm the Plan*

The hearings at which the Bankruptcy Court will determine whether to approve this Disclosure Statement and confirm the Plan will take place in Circuit Courtroom B, Fourth Floor of the Warren County Justice Center, 1001 Bowling Green, Kentucky 42101, at a date and time to be determined by the Bankruptcy Court and published pursuant the provisions of the first paragraph of this Section I.C.

2.      *Voting to Accept or Reject the Plan*

See Section IV.A below to determine whether you may be eligible to vote on the Plan.

If you are entitled to vote to accept or reject the Plan, indicate your vote on the ballot provided to you by Debtors' counsel and return the ballot via one (1) of the following methods:

If by Regular U.S. Mail:
    Seiller Waterman LLC
    Attn:  Rebecca Elliott
    462 South Fourth Street, 22nd Fl.
    Louisville, Kentucky  40202

If by Facsimile:
    (502) 371-9253

If by Electronic Mail:
    belliott@derbycitylaw.com

Your ballot must be received by the Voting Deadline (as described in the Order Approving the Disclosure Statement or other Bankruptcy Court Order) or it will not be counted.

3. *Deadlines for Objecting to the Adequacy of Disclosure and/or Confirmation of the Plan*

Objections to approval of this Disclosure Statement or to the confirmation of the Plan must be filed with the Bankruptcy Court and served upon counsel for the Debtors and the Office of the United States Trustee by the respective Objection Deadlines (as described in the Order Approving the Disclosure Statement or other Bankruptcy Court Order).

4. *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact counsel for the Debtors via the contact information below:

David M. Cantor, Esq.
Tyler R. Yeager, Esq.
Seiller Waterman LLC
462 South 4th Street, 22nd Floor
Louisville, Kentucky 40202
Telephone: (502) 584-7400
Electronic mail: cantor@derbycitylaw.com
Electronic mail: yeager@derbycitylaw.com
Facsimile: (502) 583-2100

## II. BACKGROUND

### A. Description and History of the Debtors' Businesses

The Debtors are limited liability companies organized under the laws of the Commonwealth of Kentucky and collectively engaged in the business of furniture manufacturing, sales and delivery. In 1992, Industries and many of its employees moved from California to its present location in Bowling Green, Kentucky. At the height of the companies' production, the Debtors generated approximately $45 million in gross annual revenues and employed more than 1,000 individuals. The Debtors presently employ approximately 300 individuals, not including Industries' independent sales representatives located throughout Canada and the forty-eight (48) contiguous states, and have averaged $34.6 million gross revenues in each of the three (3) fiscal years prior to the Petition Date, with gross sales decreasing to $27 million in fiscal year 2010.

### B. Insiders of the Debtors

Prior to the Petition Date, the holders of Debtors' membership interests, Girard Besanceney, Michael Luken and Amado Rivas, abandoned their equity interests to Felipe Rivas, Santos Mendez, Jose Rivas and Reyes Alfaro. At that time, although Amado Rivas was involved in the Debtors' day-to-day operations as general manager, the Debtors and Mssrs. Besanceney and Luken had distanced

themselves following months of discord. The persons in control of the Debtors immediately prior to the Petition Date were generally of the opinion that their continued association with Mssrs. Besanceney and Luken were detrimental to the companies both internally and as a matter of preserving valuable relationships with creditors and customers.

The Debtors' current management has been provided normal, market-rate compensation and benefits packages in the periods both prior to and following the Petition Date, commensurate with the performance of their respective duties as officers of the Debtors. However, the Debtors' current management cannot attest to the total pre-petition compensation or other value received, rather directly or indirectly, by Mssrs. Besanceney and Luken. The Debtors' current management does, however, hereby represent and warrant that there have been no post-petition transfers to the estranged insiders or their affiliates.

C.     **Events Leading to Chapter 11 Filing**

The Debtors attribute their need to seek relief under Chapter 11 of the Bankruptcy Code to a confluence of several factors which impaired their financial well-being. Like so many other American manufacturing companies, Industries has been facing tremendous pressure from direct competition out of China for more than a decade. Moreover, at a time when Industries should have been trying to cut costs of production, it was being hamstrung by now-former management's self-dealings, which required Industries to purchase lower quality wood and other supplies for above-market rates. Finally, Industries has experienced significant rates of customer attrition as their primary customers, independent or regional furniture outlets, have substantially reduced inventories or gone out of business.

D.     **Significant Events During the Bankruptcy Case**

1.     *Automatic Stay*

An immediate effect of the filing of the Debtors' chapter 11 petitions was the imposition of the automatic stay under § 362(a) of the Bankruptcy Code which enjoined, with limited exceptions, the commencement or continuation of the enforcement of liens against the Debtors' property, the continuation of litigation against the Debtors and any other collection efforts by creditors. This relief afforded the Debtors with the "breathing spell" necessary to assess and reorganize their businesses. The automatic stay remains in effect, unless modified by the Bankruptcy Court or applicable law, until the Effective Date.

2.     *Post-Petition Financing of Operations*

The Debtors encountered liquidity problems as a result of their pre-petition wind-down of operations, which included a temporary layoff of non-essential personnel and a substantial decrease in production. By October 2010, Industries was turning away new purchase orders that it lacked resources to complete, and faced uncertainty in meeting its payroll obligations. Upon repeatedly turning away business from its established customer base and new customers drawn to Industries' high quality furniture, the Debtors on-site management team felt compelled to attempt to ramp up Debtors' operations and salvage the business' going concern value. Accordingly, the Debtors sought a short-term loan to fund payroll and other expenses necessary to return to normal operations.

a. <u>Citizens First DIP Loan</u>.  Recognizing the difficulty in procuring necessary financing from sources not familiar with the Debtors' business, the Debtors' negotiated feasible terms for a short-term post-petition loan from its existing primary secured lender, Citizens First Bank ("<u>Citizens First</u>"). Citizens First agreed to lend $371,000.00 to the Debtors upon commencement of the chapter 11 cases, on an emergency basis, in exchange for a super-priority administrative claim status and a lien on all of the Debtors' pre- and post-petition assets. On October 29, 2010, the Bankruptcy Court approved the Debtors' and Citizens First's post-petition loan agreement.

b. <u>Subordinate DIP Loan</u>.   As a condition to its agreement to loan money to the Debtors on a post-petition basis, Citizens First required Debtors to obtain a post-petition financing commitment from one or more secondary sources in an amount not less than $70,000.00. Accordingly, the Debtors' four (4) members each agreed to loan $17,500.00 to the Debtors' upon commencement of the chapter 11 cases, on an emergency basis, in exchange for super-priority administrative claim status. On October 29, 2010, the Bankruptcy Court approved the Debtors' post-petition loan agreements with each of the members.

3.   *Use of Cash Collateral*

As of the Petition Date, all of the Debtors' operating cash had been pledged as security for the payment obligations of the Debtors arising under the collective pre-petition indebtedness owed to Citizens First. Thus, all of the Debtors' cash, accounts receivable, inventory and proceeds constituted cash collateral of Citizens First (the "<u>Cash Collateral</u>"). The Debtors initially obtained temporary authorization to use the Cash Collateral through Interim Agreed Orders Authorizing Debtors to Use Cash Collateral and Granting Adequate Protection approved by the Bankruptcy Court on October 29, 2010 (collectively, the "<u>First Interim Cash Collateral Order</u>"). The terms of the First Interim Cash Collateral Order were extended, as modified by agreement of the parties and approval of the Bankruptcy Court, in an Agreed Order (i) Authorizing Debtor to Utilize Cash Collateral of Pre-Petition Lender, and (ii) Granting Adequate Protection [Document No. 53] on November 30, 2010 (the "<u>Second Interim Cash Collateral Order</u>"). The Second Interim Cash Collateral Order authorized Debtors' possession and use of the Cash Collateral in the ordinary course of business through February 24, 2011, subject to the continuing replacement liens of Citizens First and certain timely payments of amounts due by the Debtors.

Following entry of the Second Interim Cash Collateral Order, the Debtors and Citizens First negotiated and agreed to the continued use of the Cash Collateral, subject to certain restrictions, limitations and periodic review by Citizens First during the pendency of these chapter 11 cases. The parties' agreements concerning the Cash Collateral were memorialized in an Amended Agreed Order (i) Authorizing Debtors to Utilize Cash Collateral of Citizens First Bank; (ii) Granting Adequate Protection to Citizens First Bank pursuant to 11 U.S.C. §§ 105, 361 and 363; and (iii) Establishing Debt Repayment Terms [Document No. 163] (the "<u>Final Cash Collateral Order</u>"). The Final Cash Collateral Order provides for, among other things, continuation of Debtors' use of Cash Collateral through August 23, 2011, and a significant restructuring of the Debtors' repayment obligations arising under the pre-petition indebtedness owed to Citizens First and the debtor in possession financing advanced by Citizens First.

The ability of the Debtors to use the Cash Collateral during the pendency of these chapter 11 cases has been vital to the Debtors' sustained ability to maintain normal business operations and restructure as contemplated by the Plan. The Debtors believe that the agreed upon repayment terms as set forth in the Final Cash Collateral Order are feasible in light of their anticipated future operations.

4.      *Joint Administration*

On November 2, 2010, the Bankruptcy Court ordered that the Debtors' chapter 11 cases be administratively consolidated pursuant to Bankruptcy Rule 1015(b). The Debtors sought the Order of Joint Administration to increase the efficiency with which the chapter 11 cases could be handled both by the Bankruptcy Court and counsel for the Debtors. However, the Order of Joint Administration did not substantively consolidate the Debtors' estates with one another, and the Debtors have not heretofore sought such substantive consolidation of their respective estates.

5.      *Treatment of Leases*

Per their duties and powers as debtors in possession herein, the Debtors evaluated certain unexpired leases under which either or both Debtors were lessees of non-residential real property and personal property to consider (a) the Debtors' ability to perform obligations remaining thereunder and (b) the benefits of Debtors' continued access to or possession of the leased properties. Based on these considerations and their post-petition negotiations with certain lessors to the unexpired leases, the Debtors elected to reject, either affirmatively or by operation of law, those leases which the Debtors deemed economically unfavorable or not necessary to the reorganization proposed herein. In other instances, the Debtors successfully negotiated a modification of lease terms which allowed the Debtors to maintain possession of leased property and return other, unnecessary leased property in order to limit the Debtors' accrual of post-petition liabilities under the leases. Finally, the Debtors have continued to perform their obligations under those unexpired leases which they intend to assume pursuant to the terms of the Plan. As a result of the Debtors' post-petition rejection and modification of unexpired leases, the Debtors have reduced annual expenses by more than $500,000.00.

6.      *Sale or Abandonment of Assets*

Prior to the bankruptcy filing, the Debtors' management acknowledged that even if operations were to continue, Industries and Transportation would be unable to return to their peak production and sales volumes. As part of their strategic restructuring, the Debtors analyzed their capital asset structure to identify those assets which were of substantial value yet unnecessary to the Debtors' effective reorganization. Through this process, the Debtors obtained Bankruptcy Court approval to sell certain unnecessary vehicles to third parties, or otherwise abandon vehicles to their respective lienholders. In each such instance, the Debtors relieved themselves of significant secured indebtedness, and were often able to also reduce their overall indebtedness to Citizens First. Furthermore, Industries continues to market for sale or lease substantial unused portions of its real estate and buildings, and will utilize any proceeds generated therefrom to reduce and/or service the indebtedness owed to PBI, Inc., which is secured by Industries' real property. Due to the capital asset dispositions described herein and anticipated post-Conformation, the Debtors expect to emerge from Chapter 11 a leaner and more efficient enterprise.

7.      *Extended Exclusivity Period*

From time to time throughout the pendency of these chapter 11 cases, the Debtors have requested and received from the Bankruptcy Court orders preserving their exclusive right to propose and solicit votes accepting a chapter 11 plan. The period in which the Debtors have an exclusive right to propose and solicit votes on a plan is currently set to expire on August 22, 2011.

E.   **Projected Recovery of Avoidable Transfers**

The Debtors have reviewed their financial records and accounts in light of their powers and duties as debtors in possession. Based on their review of their records and advice of counsel, at this time the Debtors do not intend to pursue, but do not waive, any preference, fraudulent conveyance, or other avoidance actions at this time. Rather, prior to Confirmation the Debtors shall assign to the Official Committee of Unsecured Creditors all preference, fraudulent conveyance or other avoidance actions, known or unknown, except those arising from inter-company transactions or otherwise barred by a prior Final Order of the Bankruptcy Court. Any money or property recovered by the Official Committee of Unsecured Creditors pursuant to its position as the assignee of Debtors' right, title and interest in all preference, fraudulent conveyance and other avoidance actions shall be distributed first to pay allowed administrative expenses incurred in pursuit thereof, with the remainder to be distributed, pro rata, to holders of Allowed Class 4 Claims.

F.   **Claims Objections**

Except to the extent that a claim is already an Allowed Claim pursuant to a final non-appealable order, the Debtors reserve the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article VI of the Plan.

G.   **Current and Historical Financial Conditions**

The identity and current fair market value of the estates' assets are listed in **Exhibit A**. The values listed in Exhibit A are based upon the data available in the Debtors' pre-petition financial statements, bankruptcy schedules and most recent monthly operating report.

A summary of the Debtors' monthly operating reports filed since the commencement of the Debtors' bankruptcy cases is set forth in **Exhibit B**.

III.   **SUMMARY OF THE PLAN OF REORGANIZATION**

A.   **Purpose of the Plan of Reorganization**

As required by the Bankruptcy Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

B.   **Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Bankruptcy Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They

may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Bankruptcy Code. As such, the Plan Proponents have *not* placed the following claims in any class:

1.    *Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtors' chapter 11 case which are allowed under § 503(b) of the Bankruptcy Code and entitled to priority under § 507(a)(2) of the Bankruptcy Code. Administrative expenses also include the value of any goods sold to the Debtors in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Bankruptcy Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following table lists the Debtors' estimated administrative expenses and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | $264,000 | Paid in full on the Effective Date of the Plan, or according to terms of obligation if later |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | [NONE] | Paid in full on the Effective Date of the Plan, or according to terms of obligation if later |
| Professional Fees, as approved by the Bankruptcy Court. | $65,000 | Paid in full on the Effective Date of the Plan, or according to separate written agreement, or according to court order if such fees have not been approved by the Bankruptcy Court on the Effective Date of the Plan |
| Clerk's Office Fees | [NONE] | Paid in full on the Effective Date of the Plan |
| Other administrative expenses | [NONE] | Paid in full on the Effective Date of the Plan or according to separate written agreement |
| Office of the U.S. Trustee Fees | $13,650 | Paid in full on the Effective Date of the Plan |
| TOTAL | $342,650 | |

2.    *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Bankruptcy Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding five (5) years from the order for relief.

C.    **Classes of Claims and Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1. *Super-Priority Claims*

Certain post-petition "super-priority" claims approved and allowed by the Bankruptcy Court pursuant to § 364(c)(1) of the Bankruptcy Code are required to be placed in classes. Holders of allowed super-priority claims are entitled to have their claims paid in full before any distribution of value to creditors holding claims allowed pursuant to §§ 502 or 503 of the Bankruptcy Code.

The following table identifies all classes of post-petition super-priority Claims against the Debtors:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 1-A | *Super-Priority Claim of:* Citizens First Bank | Impaired | Citizens First will have its Super-Priority Claim paid in full according to the terms of the parties' Bankruptcy Court approved Amended Agreed Order (I) Authorizing Debtor to Utilize Cash Collateral of Citizens First Bank; (II) Granting Adequate Protection to Citizens First Bank Pursuant to U.S.C. §§ 105, 361 and 363; and (III) Establishing Debt Repayment Terms [Document No. 163]. |
| 1-B | *Super-Priority Claim of:* Subordinate DIP Lenders | Impaired | Each holder of an Allowed Class 1-B Claim will have his Super-Priority Claim satisfied in full on the Effective Date upon issuance and pro rata distribution of new membership interests in each of the Debtors. |

2. *Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code are required to be placed in classes. The Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date of the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment.

As of the date the Plan has been proposed, there are no known holders of claims entitled to priority under §§ 507(a)(1), (4), (5), (6) or (7) of the Bankruptcy Code. Therefore, the Debtors have not specifically provided for treatment of such a class other than the default treatment set forth in the Bankruptcy Code. Debtors reserve their right to amend the Plan to provide treatment of priority unsecured claims in accordance with §1129 of the Bankruptcy Code if any claim becomes an allowed claim entitled to priority under this section.

3. *Secured Claims*

Allowed Secured Claims are claims secured by property of the Debtors' bankruptcy estates to the extent allowed as secured claims under § 506 of the Bankruptcy Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The following table lists all classes containing holders of secured prepetition claims against the Debtors and their proposed treatment under the Plan:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 3-A | *Secured Claim of:* Citizens First Bank<br><br>*Collateral:* All of the Debtors' accounts receivable, inventory, equipment, chattel paper and general intangibles, and certain trucks and trailers owned by Transportation.<br><br>*Allowed Secured Amount:* $3,671,140.28<br><br>*Priority of Lien:* First<br><br>*Total Claim:* $3,671,140.28 | Impaired | Citizens First will retain its liens and have its Secured Claim paid in full according to the terms of the parties' Bankruptcy Court approved Amended Agreed Order (I) Authorizing Debtor to Utilize Cash Collateral of Citizens First Bank; (II) Granting Adequate Protection to Citizens First Bank Pursuant to U.S.C. §§ 105, 361 and 363; and (III) Establishing Debt Repayment Terms [Document No. 163]. |
| 3-B | *Secured claim of:* PBI Bank, Inc.<br><br>*Collateral:* Real property owned by Industries, including Parcels I through IV, as described in that certain Mortgage dated July 29, 2002, of record in the Warren County Court Clerk's Office in Mortgage Book 1289, Page 189 (subject to an October 2008 sell-off of approximately 3.161 acres); an Assignment of Rents and Leases dated July 29, 2002, of record in Mortgage Book 1289, Page 205, in the Office of the Warren County Clerk; a first priority mortgage lien on Parcel V, as described in that certain mortgage dated July 29, 2002, of record in the Warren County Court Clerk's Office in Mortgage Book 1289, Page 198; and an Assignment of Rents and Leases dated July 29, 2002, of record in Mortgage Book 1289, Page 212, in the Office of the Warren County Court Clerk<br><br>*Allowed Secured Amount:* $6,894,400.54<br><br>*Priority of lien:* First<br><br>*Total claim:* $6,894,400.54 | Impaired | PBI will retain its liens and have its Secured Claim paid in full through regular monthly cash payments to cover principal and interest accruing under the terms of the pre-petition promissory note through the end of Debtors' fiscal year 2014, except that the Debtors will make reduced payments during the calendar months of June through September through calendar year 2013. Beginning in Debtors' fiscal year 2015, the regular monthly cash payments of principal and interest will increase to $65,940.85, and continue through the end of fiscal year 2021. In fiscal year 2022, the Debtors will make twelve (12) regular monthly principal and interest payment of $70,940.85. On or before August 1, 2022, the Debtors shall pay the remaining principal and all accrued but unpaid interest due under the terms of the pre-petition promissory note. In the event that the Debtors satisfy a Class 3-B Claim prior to August 1, 2022, holders of a Class 3-B Secured Claim will not be entitled to any pre-payment penalty or surcharge. |

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 3-C | *Secured claim of:* PNC Equipment Finance, LLC<br><br>*Collateral:* Purchase money security interest in one (1) flat-line system and sealer booth.<br><br>*Allowed Secured Amount:*<br>$75,000.00<br><br>*Priority of lien:* First<br><br>*Total claim:*<br>$75,000.00, less amounts paid prior to Confirmation. | Unimpaired | PNCEF will retain its lien and have its Secured Claim paid in full according to the terms of the parties' Purchase Agreement Regarding Sale of Equipment. In the event that the Debtors satisfy a Class 3-C Secured Claim prior to May 31, 2014, holders of a Class 3-C Secured Claim will not be entitled to any pre-payment penalty or surcharge. |

    4.    *General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Bankruptcy Code.

The following table identifies the proposed treatment of general unsecured claims against the Debtors under the Plan:

| Class # | Description | Impairment | Treatment | |
|---------|-------------|------------|-----------|--|
| 4 | Unsecured Claims not entitled to priority | Impaired | Distribution | Cash payments representing holders' pro-rata share of $100,000.00 |
| | | | Payments Begin | Sixty (60) days after the Effective Date |
| | | | Payments End | Sixty (60) months after the Effective Date |

    5.    *Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtors. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company ("LLC"), the equity interest holders are the members.

The following table identifies proposed treatment of the class of equity interest holders under the Plan:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 5 | Equity interest holders | Impaired | Membership interests canceled |

### D. Means of Implementing the Plan

#### 1. *Source of Payments*

Upon entry of the Confirmation Order, the Debtors will continue to operate their businesses and manage their assets, which will generate income projected to be sufficient for the Debtors to meet their ongoing operating expenses and obligations contemplated under the Plan.

#### 2. *Post-Confirmation Management*

The Post-Confirmation Managers of the Debtors, and their compensation, shall be as follows:

| Employee | Position | Membership Interest | Annual Compensation |
|---|---|---|---|
| Amado Rivas | General Manager | None | $135,047 |
| S. German Mendez | Supervisor | 25% | $49,954 |
| Felipe Murillo Rivas | Supervisor | 25% | $51,555 |
| Reyes Alfaro | Supervisor | 25% | $48,083 |
| J. Oliver Rivas | Supervisor | 25% | $54,648 |
| James Bond | Sales Manager | None | $101,280 |
| Mike Ingram | IT Manager | None | $89,747 |
| Janice Haas | Controller | None | $80,040 |

### E. Risk Factors

The holder of a claim against the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

#### 1. *The Debtors may not be able to obtain confirmation of the Plan.*

The Debtors cannot insure that they will receive the requisite acceptances from the holders of allowed claims to confirm the Plan. Even if all impaired classes accept or could be deemed to have accepted the Plan, the Debtors cannot insure that the Bankruptcy Court will confirm the Plan. One or more non-accepting holder(s) of claim(s), or the United States Trustee, might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in

compliance with the Bankruptcy Code or the Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for Confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) confirmation of the Plan is not likely to be followed by liquidation or a need for further financial reorganization; (b) the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (c) the value of distributions to dissenting holders of claims and interests will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (d) the Plan and the Debtors have otherwise complied with the applicable provisions of the Bankruptcy Code. Although the Debtors believe that the Plan will meet all applicable tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

If the Plan is not confirmed, it is unclear whether a restructuring of the Debtors could be implemented and what distributions holders of claims ultimately would receive with respect to their claims. If an alternative reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case it is likely that holders of claims would receive substantially less favorable treatment than they would receive under the Plan.

2. *The actual allowed amounts of claims may vary from the estimated claims and reduce the percentage recovery on general unsecured claims.*

The estimated claims described in the Plan and Disclosure Statement are based on various assumptions and the actual allowed amounts of claims may significantly differ from the estimates. In addition, the Debtors may have omitted, whether by error or ignorance, a claim that is ultimately proven to be an allowed claim which could alter the recovery realized by holders of general unsecured claims. Should any of the underlying assumptions relied upon in the estimation of claims ultimately prove to be incorrect, the actual allowed amounts of claims may vary from the estimated claims contained herein. As a result, such differences may materially and adversely affect the percentage recovery on Class 4 general unsecured claims under the Plan.

3. *The Debtors may attempt to achieve confirmation notwithstanding an inability to obtain necessary votes for consensual confirmation.*

Pursuant to the "cramdown" provisions of §1129 of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan at the Debtors' request if (i) at least one impaired class has accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" in such class) and (ii) with respect to each impaired class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to impaired classes. In accordance with § 1129(a)(8) of the Bankruptcy Code, the Debtors will request that the Bankruptcy Court confirm the Plan without the acceptance of all impaired classes entitled to vote.

The Debtors hereby reserve the right to modify the terms of the Plan as necessary for confirmation without the acceptance of all impaired classes. Such modification could result in less favorable treatment for any non-accepting classes than the treatment currently provided for in the Plan. Such less favorable treatment could include a distribution of property of a lesser value than that currently provided in the Plan or no distribution of property whatsoever.

> 4. *Industries' customer base could be substantially altered in a manner that affects profitability.*

Throughout its history, the Debtors have catered to the buying and shipping needs of independent or small chain home furniture stores. Unfortunately, the economic recession has caused dramatic reductions in the number of such customers and the buying power of those that remain in business. If the economy remains stagnant or worsens, the Debtors could suffer significant business losses which would impair their ability to perform their obligations under the plan.

The Debtors have attempted to adapt to the changing economic landscape by aggressively marketing Industries' products to national chain retailers and online wholesalers. Through these efforts, the Debtors envision an opportunity to increase sales volumes by reaching a much larger market segment. However, supplying product to these new customers will require increased efficiencies in the production and shipping processes which will mandate that the Debtors invest time and money in revamping some of their normal practices. The Debtors' management is confident in their ability to navigate these changes, but there is a measure of risk that should not be ignored. If the Debtors are unable to meet the needs of potential new customers, their revenues will suffer accordingly.

F.     **Executory Contracts and Unexpired Leases**

The Plan, in Table 7.01, lists all executory contracts and unexpired leases that the Debtors will assume under the Plan. Assumption means that the Debtors have elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any. Table 7.01 also lists how the Debtors will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan (the "Objection Deadline"), unless the Bankruptcy Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in Table 7.01 will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan prior to the Objection Deadline.

**Unless the Debtors have rejected a particular lease or contract prior to entry of the Confirmation Order, the deadline for filing a Proof of Claim based on a Claim arising from the rejection of a lease or contract is twenty-eight (28) days after entry of the Confirmation Order.** Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely

filed, unless the Bankruptcy Court orders otherwise. For the avoidance of doubt, any Claim arising from the rejection of a contract or lease that has been approved by the Bankruptcy Court prior to entry of the Confirmation Order shall remain subject to the August 12, 2011 deadline established by the Bankruptcy Court's Bar Date Order [Document No. 187] unless specifically authorized to be filed at a later date by a Final Order of the Bankruptcy Court.

G.    **Tax Consequences of Plan**

*Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors.*

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

1.    *General*

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW.  NO RULING HAS BEEN REQUESTED FROM THE IRS AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS.  FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND FOREIGN TAXPAYERS, NOR DOES IT ADDRESS TAX CONSEQUENCES TO HOLDERS OF INTERESTS IN THE DEBTORS.  THIS DESCRIPTION DOES NOT DISCUSS THE POSSIBLE STATE TAX OR NON-U.S. TAX CONSEQUENCES THAT MIGHT APPLY TO THE DEBTORS OR TO HOLDERS OF CLAIMS.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM.   HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

2.    *Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally*

The federal income tax consequences of the implementation of the Plan to the holders of allowed claims will depend, among other things, on the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder receives distributions under the Plan in more than one taxable year, whether the holder's claim is allowed or

disputed on the Effective Date, and whether the holder has taken a bad debt deduction or worthless security deduction with respect to its claim.

### a. Recognition of Gain or Loss

In general, a holder of an allowed claim should recognize gain or loss equal to the amount realized under the Plan in respect of its claim less the holder's tax basis in the claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the allowed claim and the holder, the length of time the holder held the claim and whether the claim was acquired at a market discount. If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation. The holder's tax basis for any property received under the Plan generally will equal the amount realized. The holder's amount realized generally will equal the sum of the cash and the fair market value of any other property received by the holder under the Plan on the Effective Date or a subsequent distribution date, less the amount (if any) treated as interest, as discussed below.

### b. Post-Effective Date Distributions

Because certain holders of allowed claims, including disputed claims that ultimately become allowed claims, may receive cash distributions after the Effective Date, the imputed interest provisions of the Internal Revenue Code may apply and cause a portion of the subsequent distribution to be treated as interest. Additionally, because holders may receive distributions with respect to an allowed claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred. All holders of allowed claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their claims.

### c. Receipt of Interest

Holders of allowed claims will recognize ordinary income to the extent that they receive cash or property that is allocable to accrued but unpaid interest which the holder has not yet included in its income. If an allowed claim includes interest, and if the holder receives less than the amount of the allowed claim pursuant to the Plan, the holder must allocate the Plan consideration between principal and interest. The holder may take the position that the amounts received pursuant to the Plan are allocable first to principal, up to the full amount of principal, and only then to interest. However, the proper allocation of Plan consideration between principal and interest is unclear and holders of allowed claims should consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an allowed claim is less than the amount that the holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

### d. Bad Debt or Worthless Securities Deduction

A holder who receives in respect of an allowed claim an amount less than the holder's tax basis in the claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under § 166(a) of the Internal Revenue Code or a worthless securities deduction under § 165(g) of the Internal Revenue Code. The rules governing the character, timing and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction

is claimed. Holders of allowed claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 3. *Information Reporting and Withholding*

Under the Internal Revenue Code's backup withholding rules, the holder of an allowed claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Holders of allowed claims may be required to establish exemption from backup withholding or make arrangements with respect to the payment of backup withholding.

## IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Bankruptcy Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A. **Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponents believe that classes 1-A, 1-B, 3-A, 3-B and 4 are impaired and that holders of allowed claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponents believe that class 3-C is unimpaired and that holders of claims in these classes, therefore, do not have the right to vote to accept or reject the Plan. Furthermore, because members of class 5 will not receive or retain any property on account of their interests in the Debtors, members of class 5 are deemed to have rejected the Plan and do not have the right to vote to accept or reject the Plan.

### 1. *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (i)

the Debtors have scheduled the claim on the Debtors' schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (ii) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Bankruptcy Rules.

      2.    *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Bankruptcy Code, a class is considered impaired if the Plan alters the legal, equitable or contractual rights of the members of that class.

      3.    *Who is **Not** Entitled to Vote*

The holders of the following types of claims and equity interests are *not* entitled to vote:

- claims and equity interests that have been disallowed by an order of the Bankruptcy Court;

- other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes;

- claims or equity interests in unimpaired classes;

- claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Bankruptcy Code;

- claims or equity interests in classes that do not receive or retain any value under the Plan; and

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

      4.    *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

    B.    **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Bankruptcy Court cannot confirm the Plan unless (i) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that

class, and (ii) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by cramdown on non-accepting classes, as discussed later in Section IV.B.2.

      1.    *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (i) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (ii) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

      2.    *Treatment of Non-Accepting Classes*

Even if one or more impaired classes reject the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner prescribed by § 1129(b) of the Bankruptcy Code. A plan that binds non-accepting classes is commonly referred to as a cramdown plan. The Bankruptcy Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Bankruptcy Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a cramdown confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

    C.    **Best Interests of Creditors**

To confirm the Plan, the Bankruptcy Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as **Exhibit C**.

    D.    **Feasibility**

The Bankruptcy Court must also find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan. To that end, the Debtors have reviewed their books and records of operations to develop what they consider to be reasonable expectations of future production and earnings. The Debtors' financial projections, in light of their knowledge and experience in the market, are presented in **Exhibit D**.

Because events and circumstances frequently do not occur as expected, there are likely to be material differences between the projected and actual results. The Debtors do not intend to update these financial projections following confirmation of the Plan.

## V.     EFFECT OF CONFIRMATION OF PLAN

A.     **Discharge of Debtors**

On the Confirmation Date of the Plan, the Debtors shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtors shall not be discharged of any debt (i) imposed by the Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Bankruptcy Rules, or (iii) of a kind specified in § 1141(d)(6)(B). After the effective date of the Plan your claims against the Debtors will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

B.     **Modification of Plan**

The Plan Proponents may modify the Plan at any time before confirmation of the Plan. However, the Bankruptcy Court may require a new disclosure statement and/or revoting on the Plan.

The Plan Proponents may also seek to modify the Plan at any time after confirmation only if (i) the Plan has not been substantially consummated *and* (ii) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

C.     **Final Decree**

Once the estates have been fully administered, as provided in Rule 3022 of the Bankruptcy Rules, the Plan Proponents, or such other party as the Bankruptcy Court shall designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

VI.     **RECOMMENDATION AND CONCLUSION**

It is Debtors' position that the Plan is substantially preferable to a liquidation under chapter 7 of the Bankruptcy Code. It is important that you exercise your right to vote on the Plan. It is the belief of the Debtors that the Plan fairly and equitably provides for the treatment of all claims against the Debtors. **The Debtors recommend and urge all creditors to vote to accept the Plan.**

IN WITNESS WHEREOF, the Debtors have submitted this Disclosure Statement this 22nd day of August, 2011.

DEBTORS AND DEBTORS IN POSSESSION


By: /s/ Amado Rivas
　　　AMADO RIVAS
　　　General Manager
　　　Eagle Industries, LLC and Eagle
　　　Transportation, LLC

/s/ Tyler R. Yeager

DAVID M. CANTOR
TYLER R. YEAGER
SEILLER WATERMAN LLC
Meidinger Tower, 22nd Floor
462 S. 4th Street
Louisville, Kentucky 40202
Telephone: (502) 584-7400
Facsimile: (502) 583-9241
E-mail: cantor@derbycitylaw.com
E-mail: yeager@derbycitylaw.com
*Counsel for Eagle Industries, LLC and Eagle Transportation, LLC*

# INDEX OF EXHIBITS

Exhibit

   A.          Valuation of Debtors' Material Assets

   B.          Summary of Post-Petition Operating Reports

   C.          Liquidation Analysis

   D.          Financial Projections